**Opinion issued July 29, 2025.**



**In The**

# Court of Appeals

**For The**

# First District of Texas

_____

**NO. 01-23-00936-CR**

_____

**KEMPSHA LARTHA WILSON, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 176th District Court**
**Harris County, Texas**
**Trial Court Case No. 1760427**

---

**MEMORANDUM OPINION**

A jury convicted appellant of the offense of murder. TEX. PENAL CODE § 19.02. The same jury returned a punishment verdict of life imprisonment in the Institutional Division of the Texas Department of Criminal Justice. Appellant brings this appeal, claiming that the evidence is legally insufficient, the trial court

erred in denying his motion for directed verdict, and his sentence is cruel and unusual. We affirm.

## Background

Sterling Nichols lived in a townhome with her older brother (decedent Spencer Nichols) and both Sterling's and Spencer's children. Sterling was dating appellant, who would stay at the townhome two or three nights at a time and kept certain belongings there. Around Valentine's Day of 2022, Sterling and appellant had not been getting along and were arguing. At some point, appellant began moving his belongings out of the townhome, and his other girlfriend came with her truck and began helping appellant move. When Sterling started helping appellant get his belongings, the argument became more heated. Sterling lured appellant outside and then hurried inside and locked her door. Appellant kicked in the door, dragged Sterling outside, threw her to the ground, threw her on the truck, and choked and hit her. Appellant dragged Sterling back into the townhome and into her bedroom and proceeded to choke her. At this point, Sterling's daughters woke up and came downstairs into the bedroom. When Sterling's daughter asked appellant why he was choking Sterling, appellant stopped and said that he was not doing anything. Sterling went upstairs to check on her other children, and then grabbed her phone and her gun. Sterling asked her daughter to call the police. Sterling pointed her gun at appellant, asking him to go before firing a shot at the

2

ground. Appellant went into Sterling's room and got his gun, an assault rifle. Sterling was at the top of the stairs, and appellant was at the foot of the stairs while both aimed their guns at one another. Appellant dropped his gun and ran out the door. Eventually, Spencer came back to the townhome. Spencer observed that the door had been kicked in and talked with Sterling about her plan to end the relationship with appellant and move out of the townhome. Later, appellant returned to the townhome and Spencer told appellant that appellant was no longer welcome there. Appellant tried to come into the townhome again, and Spencer punched appellant and knocked him to the ground. Appellant got back up and continued to try to speak with Sterling and Spencer continued to send him away. At approximately 2 or 3 a.m. on Feb. 15, 2022, appellant left the townhome.

Appellant called Sterling from the corner gas station and told her "how [appellant] was going to shoot [Sterling's] house up when [Sterling's] kids went to school and how [Sterling] got [appellant] messed up and all [appellant] was going to do to [Sterling] and [Spencer]." Sterling testified that appellant made similar calls multiple times throughout the night. Sterling and Spencer gathered the kids and brought them to Spencer's girlfriend's house. Sterling returned to her own townhome and stacked boxes to block the broken front door. Around 11 a.m., Spencer returned to the townhome with the children. Spencer began trying to secure the door and Sterling began trying to get the kids situated in the car. At this

point, Sterling observed appellant driving a truck with multiple cars following him entering the driveway. Appellant's friend Paul was in the truck with him. Appellant's brother was in another car—a Chrysler—with another person whom Sterling did not recognize. Appellant was wearing sweatpants and a t-shirt with a gun holstered in the middle of his sweatpants. The two men in the Chrysler were also carrying guns. Sterling pleaded with appellant not to do whatever he was going to do because the children were there. Appellant began pistol-whipping Spencer in the face. As Spencer tried to get up off the ground, Sterling heard a gunshot. Sterling turned to the other men and asked if they were going to let appellant "do this." One of them pointed a gun at Sterling and told her that her brother was going to die today. Sterling went to go check on her kids, not knowing where the bullet went. Then she jumped on appellant's back to try and get him off her brother. Appellant punched Sterling and took her gun from her pocket. He then ran over to Spencer's body, picked up something off the ground, and ran back to the truck. Appellant and the men in the Chrysler drove away. Sterling's neighbors came out and began calling the police and grabbing Sterling's children.

L.N.[1] is Sterling's daughter. L.N. recalls waking up the night before the shooting to her mother's screams. L.N. looked out the window to see appellant on top of Sterling, choking her. L.N. ran downstairs and watched as appellant choked

---

[1] Because L.N. is a child under 18, we refer to her by her initials. *See* TEX. R. APP. P. 9.10(a)(3).

Sterling and pushed her through the townhome. Appellant stopped choking Sterling when he saw L.N. L.N. ran back upstairs and woke up her sister. Sterling came up the stairs and gave L.N. the phone to call 9-1-1. L.N. also watched as Sterling got her gun and fired a warning shot at the wall to get appellant to leave. Eventually, appellant left and L.N. watched through the window as Sterling and Spencer chased appellant, who was riding a bicycle. Spencer came back inside and gathered the children to leave the townhome and sleep in the other apartment. L.N. recalled that, when they returned to the townhome the next day, appellant pulled up with other people and that appellant and one other person were holding guns. L.N. observed Sterling try to pull out her gun and appellant take it from her as the two fought. Spencer came to Sterling's aid, which is when appellant hit Spencer with the gun. Spencer bent over and appellant pointed the gun at Spencer's chest and shot him. While L.N. ran to Spencer, appellant and the other men ran to their cars and drove away.

Houston Police Department Officer Myron Hunter was the first patrol officer who responded to the calls regarding the shooting. A witness flagged down Officer Hunter as Officer Hunter approached the scene, at which time Officer Hunter observed a deceased male lying unresponsive in the front doorway of the

5

townhome. Other officers arrived shortly after Officer Hunter and helped him secure the scene. While the officers secured the scene, the ambulance arrived.

Isidro De Paz is a firefighter paramedic with the Houston Fire Department. At approximately 12:30 p.m. on February 15, 2022, De Paz was dispatched to a call for a possible stab wound and shooting at an apartment complex in Harris County. On arrival, De Paz saw a man lying on the ground in front of a door near a stairwell. The man had a swollen eye and a gunshot wound to the center of his chest. The man was not breathing and had no pulse.

Detective Sarin Chettry works in the Houston Police Department's Homicide Division. She arrived at the scene soon after Officer Hunter, who guided her through the scene. Detective Chettry canvassed the area, finding a surveillance camera on the property. Detective Chettry authenticated the surveillance video from the leasing office, which depicted appellant's vehicle, a black Chevrolet Silverado, and a silver Chrysler entering and exiting the apartment complex. She testified that police also recovered a bullet and a shell casing at the scene. Police did not recover any weapons at the scene.

Dr. Merrill Hines is a contract forensic pathologist for the Harris County Institute of Forensic Sciences. Dr. Hines performed an autopsy on the decedent. Dr. Hines opined that the shooter was within inches of the decedent due to the amount of soot and stippling on the decedent's body. Dr. Hines also observed a

6

blunt force injury to the decedent's eye not related to the gunshot wound. Dr. Hines opined that the cause of death was a gunshot wound to the chest and into the arm.

Elvira Medina was dating appellant. Medina came to the townhome on the night of February 14, 2022 to pick up appellant. Medina recalled that there was another woman there who said that the woman was going to shoot up her truck if appellant left with Medina. The woman was screaming, slamming the door, and referring to Medina using derogatory terms.

## Sufficiency of the Evidence and Directed Verdict

Appellant argues that there is not enough evidence to prove that appellant had the requisite culpable mental state, or mens rea, to commit the offense, where he had no prior animosity with Spencer, came to the townhome to collect his things, and had "repeatedly retreated" in past conflicts with Spencer and his sister, and where "the record reflects that [Sterling's] .380 pistol was the weapon that killed the complainant." Appellant also argues that the trial court erred in denying his motion for directed verdict.

## A.     Standard of Review

A challenge to the trial court's ruling on a motion for directed verdict is a challenge to the legal sufficiency of the evidence to support the conviction. *Williams v. State*, 937 S.W.2d 479, 482 (Tex. Crim. App. 1996).

7

We apply the legal sufficiency standard set out in *Jackson v. Virginia*, 443 U.S. 307 (1979), in determining whether the evidence is sufficient to support each element of a criminal offense that the state must prove beyond a reasonable doubt. *See Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010). We review the legal sufficiency of the evidence by determining "whether, after viewing the evidence in the light most favorable to the verdict, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Sanders v. State*, 119 S.W.3d 818, 820 (Tex. Crim. App. 2003). Under a legal sufficiency review, "our role is not to become a thirteenth juror." *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007) (quoting *Dewberry v. State*, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999)). "This Court may not re-evaluate the weight and credibility of the record evidence and thereby substitute our judgment for that of the fact-finder." *Williams*, 235 S.W.3d at 750 (quoting *Dewberry*, 4 S.W.3d at 740). Our role is to act as a "due process safeguard," requiring us to "ensure that the evidence presented actually supports a conclusion that the defendant committed" the offense of which he is accused. *Williams*, 235 S.W.3d at 750. We may consider both direct and circumstantial evidence in our legal sufficiency analysis, as well as any reasonable inferences that may be drawn from the evidence. *Id.*

We examine all evidence in the light most favorable to the jury's verdict to determine whether any "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319; *Williams*, 235 S.W.3d at 750. "Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor" and "the standard of review on appeal is the same for both direct and circumstantial evidence cases." *Kuciemba v. State*, 310 S.W.3d 460, 462 (Tex. Crim. App. 2010) (quoting *Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004)); *see also Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007) (stating "circumstantial evidence alone can be sufficient to establish guilt").

The trier of fact is the sole judge of the weight and credibility of the evidence. *See Zuniga v. State*, 551 S.W.3d 729, 733 (Tex. Crim. App. 2018). We thus defer to the jury to fairly "resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319. A reviewing court, faced with a record of historical facts supporting conflicting inferences, must presume the factfinder resolved any such conflict in favor of the prosecution, and must defer to that resolution. *Id.* at 326.

## B. Analysis

A person commits the offense of murder as alleged in this indictment if he either: (1) intentionally or knowingly causes the death of another person; or

(2) intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual. TEX. PENAL CODE § 19.02(b)(1), (2). A person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result. *Id*. § 6.03(a).

> A person acts knowingly, or with knowledge, with respect to the nature of his conduct or to the circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist. A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result.

*Id*. § 6.03(b). Here, the charge to the jury contained no instructions for self-defense or any other affirmative defense for the jury to consider in determining the sufficiency of the evidence.

Direct evidence of intent is not required, as it is usually gleaned from circumstantial evidence. *See Reyes v. State*, 480 S.W.3d 70, 77 (Tex. App.—Fort Worth 2015, pet. ref'd). One's actions are generally reliable circumstantial evidence of one's intentions. *Laster v. State*, 275 S.W.3d 512, 524 (Tex. Crim. App. 2009). When a person fires a deadly weapon at close range and death results, the law presumes an intent to kill. *Wharton v. State*, 711 S.W.3d 92, 102 (Tex. App.—Houston [1st Dist.] 2024, pet. ref'd).

10

In *Wharton*, we found the evidence legally sufficient in a similar murder case. 711 S.W.3d at 103. The defendant in *Wharton* arrived at the complainant's residence with a loaded firearm. *Id*. The defendant pistol-whipped the complainant, after which the defendant claimed that the gun accidentally fired and shot the complainant. *Id*. The medical examiner surmised that the gunshot entrance wound was a close-contact wound, citing red abrasions and soot around the wound. *Id*. We reasoned that from this evidence a rational trier of fact could have found that the defendant intentionally caused the complainant's death. *Wharton*, 711 S.W.3d at 104. We held the evidence was therefore legally sufficient and that the trial court did not err in denying the defendant's motion for directed verdict. *Id*.

In this case, Sterling testified that appellant called her throughout the night, telling her that appellant was going to shoot up Sterling's townhome. Both Sterling and L.N. testified that appellant arrived at the townhome with an entourage and that appellant and at least one of the other men were armed. Sterling testified that one of the unnamed men with appellant pointed a gun at Sterling and told her that her brother was going to die today. Both L.N. and Sterling testified that appellant grabbed Sterling's gun from her while it was still in her pocket. Both L.N. and Sterling testified that appellant pistol-whipped Spencer before firing a shot. L.N. testified that she saw appellant shoot Spencer immediately after pistol whipping him. Dr. Hines testified that, due to the presence of stippling and soot around the

entrance wound, the gun was likely inches away from Spencer when fired. Although there is some evidence in the record to support the fact that the fatal shot came from Sterling's gun, both witnesses testified that appellant took the gun from Sterling before Sterling removed it from her pocket.

Whether the murder weapon belonged to appellant or Sterling, the jury did not act unreasonably in finding that appellant acted knowingly or intentionally based on the evidence presented. *Wharton*, 711 S.W.3d at 104. As such, the court did not err in denying appellant's motion for directed verdict. *Williams*, 937 S.W.2d at 482.

## Cruel and Unusual Punishment

Appellant argues that his sentence is "disproportionate to the offense for which he was charged and violates the Eighth Amendment to the United States Constitution prohibiting cruel and unusual punishment, where the record reflects that he lacked the requisite mens rea for [m]urder, but received a [l]ife sentence from the jury."

### A.    Standard of Review

We review a sentence imposed by a trial court for an abuse of discretion. *Buerger v. State*, 60 S.W.3d 358, 363 (Tex. App.—Houston [14th Dist.] 2001, pet. ref'd). Generally, we will not disturb a sentence assessed within the proper statutory punishment range. *Id*.

12

**B. Analysis**

To preserve a complaint of cruel and unusual punishment for appellate review, a defendant must either object when the sentence is assessed or file a motion stating the specific grounds for the ruling desired. *See* TEX. R. APP. P. 33.1(a); *see, e.g.: Noland v. State*, 264 S.W.3d 144, 151 (Tex. App.—Houston [1st Dist.] 2007, pet. ref'd) (holding error not preserved by motion for new trial that failed to specify Eighth Amendment ground); *Wynn v. State*, 219 S.W.3d 54, 61 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd) (holding error waived for lack of cruel and unusual punishment objection); *Solis v. State*, 945 S.W.2d 300, 301-02 (Tex. App.—Houston [1st Dist.] 1997, pet. ref'd) (holding claim of cruel and unusual punishment could not be heard for first time on direct appeal and noting that, where the sentencing range is wide and discretionary, "it is reasonable to require a trial objection so that the trial court might have an opportunity to cure any error").

Conceding that appellant did not object to his sentence in the trial court, appellant cites *Solem v. Helm*, 463 U.S. 277 (1983), for the proposition that his sentence is disproportionate to the offense charged. In *Solem v. Helm*, the petitioner was sentenced to life imprisonment without the possibility of parole for bouncing a $100 check. *Id.* at 281-282, 303. Appellant also argues that the error

was so fundamental that he need not have objected to preserve error. TEX. R. EVID. 103(e).

Ordinarily, murder is a first-degree felony punishable by a sentence between 5 years and 99 years or life imprisonment and a possible fine up to $10,000. TEX. PENAL CODE § 12.32. However, in this case, where appellant stipulated that he was previously convicted of two felony offenses, the second having occurred after the first having become final, his punishment range was between 25 years and 99 years or life imprisonment. *Id*. § 12.42(d).

Because appellant did not timely object in the trial court, he has not preserved his sentencing complaints for appeal. TEX. R. APP. P. 33.1. Nor do we find that his sentence resulted from a constitutional violation so fundamental as not to require an objection to preserve error. *See Wynn*, 219 S.W.3d at 61.

**Conclusion**

We affirm the judgment.

Amparo "Amy" Guerra
Justice

Panel Consists of Justices Guerra, Gunn, and Dokupil.

Do not publish. TEX. R. APP. P. 47.2(b).